Filed 4/15/21  In re Gennyfer S. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re GENNYFER S., a Person Coming Under the Juvenile Court Law. | B307994 |
| | (Los Angeles County Super. Ct. No. 18CCJP00254) |
| CHRISTOPHER S., Petitioner, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent. | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Real Party in Interest. | |

ORIGINAL PROCEEDINGS in mandate. Lisa A. Brackelmanns, Juvenile Court Referee. Petition denied.

Los Angeles Dependency Lawyers, Law Office of Amy Einstein, Bernadette Reyes and Matthew Baker for Petitioner.

No appearance by Respondent.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Real Party in Interest.

_____

Christopher S. (Father) seeks extraordinary writ relief (Welf. & Inst. Code, § 366.26, subd. (l));[1] Cal. Rules of Court, rule 8.452) from the juvenile court's order made at the 18-month permanency review hearing terminating Father's reunification services, denying return of his daughter Gennyfer S. to his care, and setting a selection and implementation hearing (§ 366.26). Father contends substantial evidence does not support the juvenile court's order and the Los Angeles County Department of Children and Family Services (Department) failed to provide him with reasonable reunification services. Neither contention has merit. We deny the petition.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.   *Prior Dependency Case*

On June 2, 2016 the Department filed a petition on behalf of Father's children Chloe, Chelsea, and Christopher Jr. under section 300, subdivisions (b)(1) and (j), alleging Gloria L. (Mother) had endangered Christopher Jr. by failing to provide him with

---

[1]   Further statutory references are to the Welfare and Institutions Code.

2

appropriate supervision, and Mother and Father maintained an unsanitary and hazardous home, placing all three children at risk of serious harm. The petition was later amended to allege Mother had a history of illicit substance abuse and was a current user of methamphetamine. On December 8, 2016 Mother and Father pleaded no contest to the allegations they maintained a hazardous home and Mother had used illicit substances. The juvenile court sustained the allegations and declared Chloe, Chelsea, and Christopher Jr. dependents of the court. The juvenile court on December 12, 2019 terminated Father's parental rights over the three children. Father appealed, and we affirmed. (*In re Chloe S.* (July 17, 2020, B303378) [nonpub. opn.].)

B.     *Current Petition and Detention*

In January 2018 the Department received a referral that Mother had given birth to Gennyfer at home. Mother, who received no prenatal care, was transported to the hospital, where she tested positive for methamphetamine, amphetamine, and opiates. Gennyfer tested positive for methamphetamine. A social worker at the hospital reported "[t]his case was red flagged from the beginning as the mother refused a blood work and appeared to be under the influence of illicit drugs. She was high. She also refused to give a urine test."

The next day Department child social worker Aaron Gray met with Mother in the hospital. Mother said she did not take drugs during her pregnancy and "there was no way that she could have tested positive." Mother denied she or Father had any substance or mental health issues. Mother indicated she and Father were in the process of moving to Alabama. Mother lived with a friend across the street from her maternal grandfather,

3

and Father lived with the maternal grandfather. Mother explained they were living apart because of the ongoing dependency case with her three older children, but Mother and Father still loved each other.

Later that day Gray met with Father at his place of employment. Father denied using drugs and explained "he really thought that [M]other was not using drugs either but that he does not live with her so he does not know what she is doing." When asked how he could not know Mother was using drugs, Father indicated "he does not have much experience with drugs and that he has not ever known people on drugs like methamphetamine[]." Father told Gray that he had been attending Project Fatherhood and was participating in individual therapy; he loved Mother and had lunch with her at least once a week; and he and Mother would meet up occasionally. Father was having difficulty finding housing and wanted to return home to Alabama.

Prior to Gennyfer being discharged, Father and Mother agreed to a safety plan that (1) prohibited either parent from using drugs in the child's presence; (2) barred anyone who was intoxicated from caring for Gennyfer; (3) required Father to be the primary caregiver when Gennyfer left the hospital; and (4) required Mother and Father to keep the Department informed as to Gennyfer's whereabouts. Gray stressed that Father and Gennyfer should not live with Mother.

On January 8, 2018 Gray learned from the hospital social worker that Gennyfer had been discharged to Father two days earlier. Gray went to Father's home, but neither Father nor Gennyfer was there. The next day Gray talked to the supervising social worker handling the dependency case involving Gennyfer's siblings. The supervising social worker stated her belief Mother

4

"had been trying to hide the pregnancy from [the Department] and even from the other children," and "she felt that [M]other and [F]ather [were] living in the home together and that she told [F]ather several times that he can not live in the home with [M]other when he has the children return[ed] to his care." She also stated Mother and Father "have shown themselves to not be truthful in speaking to [the Department]" and Mother had not been compliant with court orders and was refusing to take drug tests.

Father called Gray on January 9 and stated he was staying with Mother because he had been living with the maternal grandfather, who became intoxicated and forced Father out of the house. Gray reminded Father of the safety plan, but Father stated "he had nowhere else to go." Gray met with Mother and Father at Mother's home later that day. When Gray entered the house, Mother was holding and feeding Gennyfer. Father said he would try to find a hotel room and he had been taking Gennyfer to work with him because "there are people there that help him to watch her while he is working."

On January 12, 2018 the Department filed a petition under section 300, subdivisions (b)(1) and (j), alleging Gennyfer had tested positive for methamphetamine at birth, Mother had tested positive for methamphetamine and amphetamine, and Mother's substance abuse placed Gennyfer at risk of serious physical harm. The petition alleged Father knew of Mother's substance abuse and Mother and Father failed to protect Gennyfer. The petition also alleged Gennyfer's three siblings were dependents of the juvenile court due to Mother's substance abuse. At the January 16, 2018 detention hearing the court ordered Gennyfer removed from Mother and Father, with the parents having three monitored visits per week.

5

C.    *The Jurisdiction and Disposition Report and Hearing*

The jurisdiction and disposition report stated the dependency investigator had interviewed Mother and Father on February 10, 2018.  Mother denied she had used drugs, claimed she had been consistently testing negative for drugs, and suggested the hospital may have falsified the drug test based on information provided by her family.  Father told the investigator he had "never seen [Mother] do any drugs in front of [him]" and "she has never done drugs while we have been together."  Father added, "She also promised and told me that she wasn't using and we hope we can get all our four kids back."  Father explained he "didn't fail to protect the child, because [he] would never put [his] children in that kind of [harm's] way."  Despite Father's denials, the Department concluded Father "clearly knew about the Mother's use during the pregnancy, and failed to intervene as he allowed the Mother to continue using illicit substances."

At the March 5, 2018 jurisdiction and disposition hearing, Father submitted proof he had attended individual counseling sessions, completed an anger management program in 2017, and attended 12 parenting group sessions.  Mother and Father pleaded no contest to the allegations in an amended petition.[2]  The juvenile court sustained the petition as to the allegations under section 300, subdivision (b)(1), and struck the allegations under subdivision (j).  The court declared Gennyfer a dependent of the court, ordered her placed in foster care, and ordered family

---

[2]    The petition was amended to state Mother was a "recent" user of methamphetamine and amphetamine; Father "reasonably should have known" of Mother's substance abuse; and Father was "unable" to protect Gennyfer.

6

reunification services for Mother and Father. The court ordered Mother to attend a drug and alcohol program with aftercare, submit to weekly drug testing, attend a 12-step program, attend a parenting program, and receive individual counseling. The court ordered Father to attend Al-Anon meetings and to participate in individual counseling with a licensed therapist to address the "effects of parents' drug use on children, co-dependency, and anger management." The court ordered six hours of monitored visits each week for Mother and Father.

D.      *Six-month Status Review Report and Hearing*

As of August 2018 Gennyfer was living with a foster family and "appear[ed] to be thriving." Mother had not enrolled in a drug rehabilitation program, was not drug testing, and did not enroll in parenting and individual counseling. Father stated he had started meeting with a therapist. He continued to work full time and was visiting Gennyfer weekly. At the September 24, 2018 review hearing, the court ordered that reunification services be continued for both parents and Father's visitation become unmonitored upon verification of Father's participation in individual counseling.

E.      *Eighteen-month Review Report and Hearing*

The Department's report for the 18-month review hearing stated that as of April 2019, Father had attended 18 individual counseling sessions addressing codependency, parenting skills, coping skills, and family functioning. According to his therapist, Father was learning new parenting skills and "has also become aware of his role in codependency with his wife [and] acknowledges and desires to correct those patterns that cause harm to a healthy relationship." Father had also completed a 12-

7

week anger management course (in November 2017). Father's visits were by this time unmonitored and were going well. Gennyfer was happy to see Father, but she did not cry when the visits were over. The Department had provided Father with housing referrals, but he was still living in a motel. Mother had still not enrolled in a drug treatment program or submitted to drug testing. The Department stated its belief Gennyfer would be at a high level of risk if she were returned home, and it recommended termination of both parents' reunification services.

At the contested 18-month review hearing on April 30, 2019, Father acknowledged he "had a really serious codependency issue with the mom," but he testified he had not seen Mother in over a year. He explained he had moved in with Mother after Gennyfer's birth because he believed the safety plan did not bar him from having contact with her, and his only alternative was to sleep in his car. Father claimed he had filed for divorce but had been unable to serve Mother. Father had since moved into a one-bedroom apartment in Long Beach and purchased a playpen with a mattress for Gennyfer, but he did not have enough money to purchase a crib. He worked from 9:00 a.m. to 7:00 p.m. and could not afford child care, but he represented his father was coming to Los Angeles to watch Gennyfer until Father could afford child care. Father's attorney requested Gennyfer be returned to Father's care and reunification services be continued.

Minor's counsel argued the Department had not met its burden to show a substantial risk of harm to Gennyfer if she were returned to Father's care. She noted "visitation has gone well without issues"; Father had completed an anger management program; and he had been consistent in his individual counseling sessions. Minor's counsel proposed the court set conditions for

Gennyfer's return to Father, including confirmation Father's home did not have safety risks; Mother could not visit the home; Father could not monitor Mother's visits with Gennyfer; and the Department would make unannounced visits to Father's home. She also requested that the Department assess the paternal grandfather and assist with Father finding child care.

The Department argued it was not safe to return Gennyfer to Father because Father had not made the necessary arrangements for child care and had not yet advanced to overnight visitation. The Department's attorney also argued reunification services for Father should be terminated.

The juvenile court found Father had "made a major effort" and was doing "pretty well," and it ordered the continuation of reunification services for Father. However, the court concluded there remained a substantial risk of detriment to Gennyfer if she were returned to Father's care because Father had no plan for how to care for Gennyfer other than his general statement that the paternal grandfather would provide child care, and the court had no information on the paternal grandfather. Father still did not have a crib for the child. The court also noted Father had not advanced to overnight visits. The court ordered the Department to help Father find child care and to obtain a crib. At the conclusion of the hearing, the court terminated reunification services for Mother and set a permanency review hearing as to Father for July 11, 2019.[3] The court ordered as to Father that

---

[3] The court heard testimony at the hearing, but it declined to treat the hearing as a permanency review hearing and instead continued the hearing to July 11, 2019 for that purpose. The hearing was continued multiple times to coordinate with the hearing on termination of parental rights for the older siblings,

the Department had discretion to release Gennyfer to Father "if they find everything in place."

F.     *Subsequent Events*

On May 6, 2019 Gennyfer's caregivers filed a request to change court order (§ 388) asking the court not to allow Gennyfer to be reunited with Father until the court could review additional information on Father and Mother and determine Gennyfer's best interests.  The request stated Father had provided inaccurate information to the juvenile court during his testimony at the April 30, 2019 hearing, including that he had not seen Mother in over a year.  According to the caregivers, Mother and Father were seen together on several occasions during that period.  The juvenile court denied the petition.

On May 14, 2019 the child social worker received a message from one of Gennyfer's caregivers stating her husband had seen Mother and Father at a local department store and videotaped Mother putting groceries into Father's car.  When the social worker asked Father the next day when he had last seen Mother, Father referred to a day that was at least two months earlier.  As of May 15 the paternal grandfather had arrived to assist with child care, and the Department provided Father with child care referrals.  Further, the Department confirmed Father had obtained a crib.

The Department stated its concern that Father was calling and sending text messages to the social worker advocating for more visitation for Mother.  On June 19 Father called the social worker requesting she "call [M]other because [M]other needed to

and in 2020 as a result of the COVID-19 pandemic.  The hearing was ultimately held on September 20, 2020.

speak to this [social worker]. . . . This [social worker] asked [F]ather 'Why are you talking about Gloria's visits[?]' Based on this series of text messages and [F]ather's insistence that [the Department] call [M]other regarding her visits, the Department believes that [F]ather is still closely connected to [M]other and is willing to advocate for [M]other."

The July 11, 2019 last minute information report voiced a concern about Father's aggressive behavior, stating, "[I]t appears that [F]ather's anger management has not been resolved due to [F]ather expressing his anger with the caregivers . . . about the video tape." The Department explained in the November 13, 2019 last minute information, "The caregiver reports that after her husband saw [M]other and [F]ather together at [the department store] and it was reported to [the] court, [F]ather began getting in her face and threatening to sue her and [her] husband. The caregiver reported that [F]ather would always get in her face when she is alone and when her husband leaves. The caregiver stated that she became afraid for her safety and that is why she decided to change [the] exchange location to the [Department's] Torrance office where there is security."

The November 13, 2019 last minute information for the court reported that Father continued to have weekly unmonitored visits with Gennyfer. However, the caregiver "reported that Gennyfer has nightmares every Tuesday night and she is moody when she returns from the visit. She stated that Gennyfer does not interact at gym class anymore. Additionally, Gennyfer has begun to bang her head." According to Father's therapist, he had only seen Father one time in September, and Father had cancelled four counseling sessions in October.

On December 1, 2019 the social worker made an unannounced visit at a restaurant where Father, the paternal

grandfather, and Gennyfer were having an unmonitored visit. Gennyfer appeared comfortable with Father and the paternal grandfather and clung to Father as he spoke with the social worker. Gennyfer "smiled a lot during the visit as it appeared she was enjoying herself." In January 2020 Father's visits were increased to eight hours each week. The social worker also observed Gennyfer playing appropriately at Father's house with the paternal grandfather present on January 15, 2020.

The Department learned in January 2020 that [M]other had given birth to baby Jayden who was "drug exposed." Mother and Father denied that Jayden was Father's child, and Father stated he had not seen Mother since January or February 2019. He added, "With [M]other . . . being on drugs, there is no telling who the baby's father may be." However, Father told the Department he "bought a bassinet just in case the baby would be placed with him" and "the baby still needs a father and he would take on the role." When the social worker asked Father whether he would take a DNA test to verify he was not the father, Father "looked a little surprised and slowly answered the question by saying 'the baby is not mine' but he did not give a definitive answer that he would or would not submit to a DNA test." Mother gave Jayden Father's last name.

In its March 23, 2020 report, the Department expressed its concern Father remained codependent with Mother, noting that when Mother was in the hospital giving birth to Jayden in January 2020, "she called [F]ather to let him know where her car was parked. If he last saw [M]other in January 2019, and is in the middle of divorcing and separating himself from [M]other, the Department wonders why [F]ather continues to come to [M]other's rescue. It is the Department's perspective that [F]ather . . . continues to demonstrate that he has an emotional

12

attachment to Mother." In response to the Department's belief Jayden was Father's child, the Department reduced Father's visits with Gennyfer to three hours.

On March 12, 2020 the social worker learned from the counseling center that Father had not had any individual counseling sessions since November 19, 2019. The director of the center stated Father's "attendance was sporadic and that his therapist . . . has since left the counseling center and [F]ather has not been assigned a new therapist because [F]ather stopped attending."

As of the Department's September 3, 2020 report, Father continued to have unmonitored visits with Gennyfer. The caregivers reported the visits were "going well" and "Gennyfer appears to be happy to see [F]ather when they visit." However, for the six months leading up to the hearing, Father only visited Gennyfer every other week (for three hours) because of his concern about taking Gennyfer outside during the COVID-19 pandemic.

F.     *The Continued 18-month Review Hearing*

The continued 18-month permanency review hearing (§ 366.22) was held on September 23, 2020, when Gennyfer was two years nine months old. Father's attorney argued that Gennyfer should be returned to Father's care because the Department had failed to show the return would be detrimental. Further, unmonitored visits had been going well, and Father and Gennyfer appeared comfortable with each other. Father completed an anger management program and had attended more than a year of individual counseling. Father's attorney asserted that "whether the Father is having continued contact with the Mother or not, if there's no evidence that he is exposing

13

her to the minor, frankly, it's not relevant to analysis. He can have whatever adult relationships with whatever adult he wants as long as the minor is well cared for and does not have contact with anyone inappropriate, who may include Mother." Father's attorney noted the Department could have continued supervision to ensure Gennyfer was safe, including unannounced home visits.

Minor's counsel observed that this was a "challenging" case because Gennyfer had grown up in the foster parents' home and Father had continued to have some contact with Mother. However, she argued even taking these factors into account, there was not substantial risk of detriment to Gennyfer. Minor's counsel noted Father was in compliance with his programs and he received a favorable review from his therapist. She added, "The fact that Father had contact with the Mother does not necessarily mean that that goes against his progress in counseling. [¶] The Father could continue to have a relationship with the Mother, whether it's romantic or friendship, without exposing Gennyfer to that. Here, in this case, there's no evidence that the Father has brought the child to the Mother during unmonitored visits . . . ." Minor's counsel also noted there was no current concern regarding Father's ability to care for Gennyfer or her safety in his care.

The Department's attorney noted that Father's parental rights to the older siblings had been terminated in December 2019 and Father was an offending parent as to a sustained petition on behalf of Jayden. Further, Father was denied family reunification services as to Jayden under section 361.5,

subdivisions (b)(10) and (11).[4]  The attorney argued the evidence showed Jayden was Father's child, including that Father refused to take a DNA test.  Father's only case plan requirements were to attend individual counseling and Al-Anon meetings, but he had stopped attending individual counseling sessions over a year ago and had not attended Al-Anon meetings.  In addition, over the prior six months Father had been visiting Gennyfer for only three hours every other week.

Counsel for the current caregivers noted Father's visitation with Gennyfer was going well "without incident."  However, they believed Father could not provide a safe home for Gennyfer, and

---

[4]      Section 361.5, subdivision (b), provides that reunification services need not be provided to a parent when the court finds by clear and convincing evidence:  "(10) That the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent or guardian pursuant to Section 361 and that parent or guardian is the same parent or guardian described in subdivision (a) and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian"; or "(11) That the parental rights of a parent over any sibling or half sibling of the child had been permanently severed, and this parent is the same parent described in subdivision (a), and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent."

15

given that Gennyfer was almost three years old, reunification services should be terminated.[5]

The juvenile court found by a preponderance of the evidence that returning Gennyfer to the physical custody of Father would create a substantial risk of detriment to the child. The court observed that Gennyfer was now "three years old [and] permanency and stability is very, very important." The court explained that Father "has been given quite a long time to engage in family reunification services and . . . I feel like [he] is stuck, and that he's kind of treading water. And, although he has done programs, he still should have continued doing individual counseling instead of stopping because he has a very strong connection to the mother of this child and the . . . previous children, where he lost parental rights, for a similar reason. And she is a serious drug addict, and he is constantly finding his way back to her. [¶] . . . I disagree that that doesn't place the children at risk because she is a serious and a long user of drugs . . . , which has put her other children at risk in which she has lost parental rights. And he—with all the counseling he received—he should have done Al-Anon. He should have continued counseling because he just could not extricate himself from her life. [¶] And I think it was very telling that, once again, when there was another—when she had another child and her pregnancy was definitely concealed from the Department, it was quite a surprise that he was in her life again, and it was thought that he was the father. He refused to give a D.N.A. test. And, so once again, it just points out that he cannot remove himself from

---

[5] The caregivers had been declared de facto parents of Gennyfer, and on this basis the juvenile court allowed them to present an argument at the hearing.

this woman's life, and she would pose a significant risk to this child as well as she did to her other children. So I do not think that he has shown insight to the very crux of why he was brought before this court." The court found the Department had provided or offered reasonable services to overcome the problems that led to removal of Gennyfer. The court terminated Father's family reunification services and set a permanency planning hearing (§ 366.26) for January 20, 2021.

On January 26, 2021 Father filed a petition for extraordinary writ requesting we order the return of Gennyfer to Father, vacate the order terminating reunification services, and order six months of additional reunification services. Father also requested we stay the section 366.26 hearing. On January 13, 2021 we issued an order to show cause, but we declined to stay the section 366.26 hearing.[6]

## DISCUSSION

A.  *Substantial Evidence Supports the Juvenile Court's Finding of Detrimental Risk to Gennyfer*

"At the 18-month permanency review hearing the juvenile court must order a child returned to a parent's custody unless it finds, by a preponderance of the evidence, that return of the child will create a substantial risk of detriment to the child's safety, protection or physical or emotional well-being. (§ 366.22, subd. (a).)" (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 864 (*Georgeanne G.*); accord, *M.G. v. Superior Court* (2020) 46 Cal.App.5th 646, 660.) "That standard

---

[6]     The section 366.26 hearing has since been continued to April 19, 2021.

17

is construed as a fairly high one.  [Citation.]  It does not mean the parent in question is less than ideal, did not benefit from reunification services as much as we might have hoped, or seemed less capable than the available foster parent or other family member." (*M.G.*, at p. 660; accord, *Georgeanne G.*, at p. 864.)  "If the child is not returned to a parent at the permanency review hearing, the court must terminate reunification services and order a hearing pursuant to section 366.26.  (§ 366.22, subd. (a).)" (*Georgeanne G.*, at p. 864; accord, *M.G.*, at p. 660 ["If the child may not safely be returned to the parents within a maximum of 18 months from removal, the court must develop a permanent plan for the child."].)  "However, the court has discretion to enter a home-of-parent order while continuing court supervision and services." (*Georgeanne G.*, at p. 864; accord, *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 312.)

"We review the juvenile court's finding of detriment for substantial evidence." (*Georgeanne G., supra*, 53 Cal.App.5th at p. 864; accord, *In re A.J.* (2015) 239 Cal.App.4th 154,160.)  ""In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.]  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.""" (*In re I.J.* (2013) 56 Cal.4th 766, 773; accord, *Georgeanne G.*, at p. 866.)

Father contends the juvenile court's finding of detriment was based on speculation because there was no evidence after two years of unmonitored visits that Father had resided with

Mother or allowed Mother access to Gennyfer.  He argues that even if he had a romantic relationship with Mother and was Jayden's father, this did not pose a substantial risk of harm to Gennyfer.  Father points to the progress he made in counseling, his positive relationship with Gennyfer, and his making of an appropriate home for Gennyfer.

Substantial evidence supports the juvenile court's finding of detriment.  Although Father is correct that his continued relationship with Mother would not pose a risk to Gennyfer absent exposure to Mother, there was ample evidence in the record showing Gennyfer continued to be at risk of exposure to Mother.  When Gennyfer was released from the hospital, Father took her to live with Mother despite the risk Mother posed and Father's agreement not to live with Mother.  Father testified the safety plan did not prevent him from doing this, but he acknowledged the social worker told him he could not reside with Mother.  Father continued to deny having a relationship with Mother, but he was videotaped with Mother in May 2019.  When asked about the incident, Father claimed he had not seen Mother since January or February 2019.  Once Father learned of the videotape, he became aggressive with the caregivers, causing them to change the exchange location to the Department's office.  And at the April 30, 2019 hearing, Father falsely testified he had not seen Mother for a year.

Further, there was significant evidence newborn Jayden was Father's child.  Mother called Father when she was in the hospital giving birth to Jayden.  Father agreed to care for Jayden; he had purchased a bassinet in case Jayden was placed with him; and Mother gave Jayden Father's last name.  Significantly, Jayden, like Gennyfer, was exposed to drugs at birth.

As of April 2019 Father had made significant progress in therapy toward understanding his codependency with Mother. But Father only attended counseling sporadically starting in September 2019, and he did not attend any counseling after November 19, 2019, although counseling was part of his case plan. Father's codependency with Mother continued, resulting in the juvenile court terminating Father's parental rights over the three older siblings based on the same issues that are present here—Father's failure to extricate himself from Mother and his cessation of counseling. At the time of the September 2020 hearing, Father's unmonitored visits with Gennyfer were going well, but he was only visiting with her three hours each week (or every other week during the COVID-19 pandemic), and he never graduated to overnight visits.

*M.G. v. Superior Court, supra*, 46 Cal.App.5th 646, relied on by Father, is distinguishable. There, the juvenile court sustained a petition as to the parents based in part on their substance abuse and domestic violence by the father and mother's boyfriend P.B. (*Id*. at pp. 650-651.) Although the mother obtained a restraining order against P.B., the court later modified the order to allow peaceful contact, and the mother planned to move in with P.B. (*Id*. at p. 654.) The mother made significant progress in addressing her substance abuse issues, but the juvenile court made a finding of detriment based on the risk P.B. posed to mother's sobriety. (*Id*. at pp. 658-659.) The Court of Appeal reversed, explaining, "The juvenile court's ruling relied on . . . vague and nebulous concerns that were not supported by evidence. The court stated it had no concerns with the parents' substance abuse. It focused on Mother's relationship with P.B., even though Mother testified she was merely friends with P.B., and her therapist testified she had no concerns about

20

Mother's relationship with P.B.  [The child welfare agency] produced no evidence contradicting that evidence.  In short, the court based its concerns on a hunch that was not supported by any evidence, stating Mother's relationship with P.B. was 'a risk to you and your sobriety.'"  (*Id.* at p. 662.)  In contrast to *M.B.*, the juvenile court here had more than a "hunch" that Father's relationship with Mother posed a substantial risk to Gennyfer.  As discussed, Father discontinued counseling, continued to see Mother while denying any contact, lost his parental rights to his three older children because of his codependency, and had a fifth child with Mother in January 2020 who was exposed to drugs.

Father's reliance on our opinion in *Georgeanne G. v. Superior Court, supra*, 53 Cal.App.5th 856, is likewise misplaced.  There, the juvenile court made a finding of detriment based on the mother living with a man (Arthur) who had been convicted of raping his former wife despite there being a no-contact order in place and no evidence Arthur had engaged in any physical or verbal abuse of the mother.  (*Id.* at pp. 859, 863.)  We rejected the juvenile court's finding the mother's lack of insight into the risk posed by Arthur created a risk of detriment, explaining, "The Department's and the court's assessment Lucas risked exposure to family violence, even with a no-contact order or monitored visitation for Arthur, depended on two inferences:  Georgeanne would violate the court order, and Arthur would commit (or was likely to commit) an act of violence against Georgeanne or perhaps Lucas.  Neither essential inference had a basis in the evidence.  [¶]  Certainly, Arthur committed a serious act of violence against his ex-wife, for which he was convicted of a felony and placed on probation.  But there was no evidence he engaged in any physical or verbal abuse toward Georgeanne during the 22 months they had been living together.  Nor was

21

there reason to believe, if violence were threatened, Georgeanne would be a passive victim and unable to protect Lucas." (*Id.* at pp. 868-869.) Further, "[w]hatever theoretical risk Arthur might pose . . . could be effectively neutralized by continuing court supervision and services while returning Lucas to Georgeanne's care." (*Id.* at p. 869.) As discussed, Father violated the initial direction he not bring newborn Gennyfer to Mother's home, repeatedly lied to the Department and the court about his contact with Mother, and then fathered another drug-exposed baby with Mother.

Because substantial evidence supports the juvenile court's finding of detriment, the court did not err in refusing to return Gennyfer to Father, and termination of reunification services was required. (§ 366.22, subd. (a); *Georgeanne G., supra,* 53 Cal.App.5th at p. 864.)

B.      *Substantial Evidence Supports the Juvenile Court's Finding That the Department Provided Reasonable Services to Father*

Father contends the Department failed to provide him reasonable reunification services because there was no evidence the Department referred him to the Al-Anon program or acknowledged this requirement prior to termination of his family reunification services. The Department acknowledges the absence of any reference in the record to the Al-Anon program after the juvenile court's initial order and prior to the permanency review hearing. But the Department contends the Al-Anon program was only one minor component of the reasonable services the Department provided, and moreover, Father cannot show that had he received a referral to Al-Anon, it is reasonably probable he would have obtained a more favorable

22

result.  Substantial evidence supports the juvenile court's finding by clear and convincing evidence the Department provided reasonable services to Father.

"In a juvenile dependency proceeding, a parent generally has a statutory right to reunification services when his or her child is removed from the parent's custody at a disposition hearing."  (*In re M.S.* (2019) 41 Cal.App.5th 568, 590; see § 361.5, subd. (a).)  Reunification services are among the "[s]ignificant safeguards" that are built into the current dependency scheme.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307-308; accord, *In re M.F.* (2019) 32 Cal.App.5th 1, 13 ["Family reunification services play a critical role in dependency proceedings."].)  Reasonable services mean "those efforts made or services offered or provided by the county welfare agency or probation department to prevent or eliminate the need for removing the child, or to resolve the issues that led to the child's removal in order for the child to be returned home, or to finalize the permanent placement of the child."  (Cal. Rules of Court, rule 5.502(33); see § 300.2 [the "safety, protection, and physical and emotional well-being [for the child] may include provision of a full array of social and health services to help the child and family and to prevent reabuse of children"].)

At the 18-month review hearing, "the juvenile court may not set a section 366.26 hearing unless it finds by clear and convincing evidence that reasonable services were offered or provided to the parent."  (*In re M.F., supra*, 32 Cal.App.5th at p. 14; see § 366.22, subd. (b)(3)(C) ["The court shall not order that a hearing pursuant to [s]ection 366.26 be held unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent or legal guardian."].)  "When reviewing a finding that a fact has been proved by clear and

23

convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.  In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence."  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012; accord, *In re V.L.* (2020) 54 Cal.App.5th 147, 155 ["*O.B.* is controlling in dependency cases"].)

""""The adequacy of the reunification plan and of the [D]epartment's efforts to provide suitable services is judged according to the circumstances of the particular case."""  (*In re T.W-1* (2017) 9 Cal.App.5th 339, 346; accord, *In re A.G.* (2017) 12 Cal.App.5th 994, 1001 ["To support a finding that reasonable services were offered or provided to the parent, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult.'"].)

Viewing the record as a whole, there was substantial evidence from which the juvenile court could find by clear and convincing evidence the Department provided Father reasonable reunification services.  The Department initially identified that Father was codependent with Mother and could not extricate himself from her despite her continued substance abuse.  As part of his individual therapy, Father received treatment with a licensed therapist to address the "effects of parents' drug use on

24

children, co-dependency, and anger management." Father received similar counseling services as part of the prior dependency case to address Mother's substance abuse, Father's codependency on Mother, and Father's failure to protect their children from the risk posed by Mother's substance abuse.

Had Father attended Al-Anon, he would have received comparable services to those he was receiving in individual counseling, albeit in a group setting. (*In re Brittany M.* (1993) 19 Cal.App.4th 1396, 1401 [Al-Anon is a co-dependency "group comprised of spouses or relatives of alcoholics"].) As its website notes, "Al-Anon is a mutual support program for people whose lives have been affected by someone else's drinking. By sharing common experiences and applying the Al-Anon principles, families and friends of alcoholics can bring positive changes to their individual situations, whether or not the alcoholic admits the existence of a drinking problem or seeks help." (Al-Anon Family Groups, What Is Al-Anon and Alateen? <https://al-anon.org/newcomers/what-is-al-anon-and-alateen/> [as of March 22, 2021].)[7]

Father has not pointed to specific services provided by Al-Anon that would have made a difference in his ability to address his codependency on Mother and his inability to protect the children from her substance abuse. Indeed, after over a year of individual counseling in this case, Father stopped attending counseling without having resolved his codependency and the effects of Mother's substance abuse that led to the filing of this case. Nothing in the record suggests that additional services on

---

[7] Although there is no evidence of Mother having a drinking problem, substance abuse addicts and their families confront similar issues.

the same subject areas—codependency and the need to protect children from the impacts of a parent's substance abuse—would have changed Father's behavior.  As the juvenile court explained in terminating reunification services, "He should have continued in counseling because he just could not extricate himself from her life."

## DISPOSITION

The petition for extraordinary writ is denied.


FEUER, J.


We concur:



PERLUSS, P. J.



SEGAL, J.